## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

ASHTON AMBROSE and B.D., by
and through his parent, Ashton
Ambrose,

      Plaintiffs,

v.                              Case No. 3:22-cv-392-MMH-PDB

ST. JOHNS COUNTY SCHOOL
BOARD,

      Defendant.

_____

## O R D E R

**THIS CAUSE** is before the Court on Defendant St. Johns County School

Board's Motion to Dismiss or for Judgment on the Pleadings (Doc. 13; Motion),

filed on May 27, 2022.[1]  In the Motion, Defendant seeks dismissal of Plaintiffs'

Corrected Complaint for Declaratory and Injunctive Relief and Demanding a

Jury Trial (Doc. 11; Complaint) pursuant to Rule 12(b)(6),[2] Federal Rules of

---

[1] In their complaint, Plaintiffs incorrectly named the "St. Johns County School District" as the Defendant, and the School District remained the named Defendant at the time Defendant filed the Motion.  See generally Complaint; Motion at 1 & n.1.  However, Plaintiffs later moved to amend the case caption.  See Plaintiffs' Motion to Amend Case Caption (Doc. 19), filed on July 14, 2022.  The Magistrate Judge granted their request, amending the caption to identify the "correct defendant," the St. Johns County School Board.  See Endorsed Order (Doc. 20), entered August 4, 2022.  Accordingly, the Court does not address Defendant's argument that the St. Johns County School District lacks capacity to be sued.  See Motion at 1 n.1 (acknowledging that the School Board, unlike the School District, is an "entity which does have the capacity to sue or be sued").

[2] Defendant titled the Motion as a "Motion to Dismiss or for Judgment on the

Civil Procedure (Rule(s)).  <u>See generally</u> Motion.  Plaintiffs Ashton Ambrose and B.D. filed a timely response in opposition to the Motion.  <u>See</u> Plaintiffs' Response to Defendant's Motion to Dismiss or Motion for Judgment on the Pleadings (Doc. 14; Response), filed June 17, 2022.  Plaintiffs also filed a Notice of Supplemental Authority (Doc. 24) on January 4, 2023.  Accordingly, this matter is ripe for review.

## I. Motion to Dismiss Standard

In ruling on a motion to dismiss, the Court must accept the factual allegations set forth in the complaint as true.  <u>See</u> <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009); <u>Swierkiewicz v. Sorema N.A.</u>, 534 U.S. 506, 508, n.1 (2002); <u>see also</u> <u>Lotierzo v. Woman's World Med. Ctr., Inc.</u>, 278 F.3d 1180, 1182 (11th Cir. 2002).  In addition, all reasonable inferences should be drawn in favor of the plaintiff.  <u>See</u> <u>Randall v. Scott</u>, 610 F.3d 701, 705 (11th Cir. 2010). Nonetheless, the plaintiff must still meet some minimal pleading requirements.

---

Pleadings."  Motion at 1.  However, despite the title, Defendant only references a judgment on the pleadings twice.  <u>See</u> Motion at 1, 3.  And Defendant devotes the substance of the Motion to addressing the standard for, and arguments in support of, dismissal under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  <u>See</u> <u>id.</u> at 5 (presenting the standard for evaluating a motion to dismiss); <u>id.</u> at 20 (requesting, in conclusion, that the Court "dismiss Plaintiffs' Complaint with prejudice").  As such, the Court construes the Motion as only seeking dismissal under Rule 12(b)(6).  Regardless, a request for judgment on the pleadings is improper at this stage of the proceedings.  A party may move for a judgment on the pleadings "[a]fter the pleadings are closed."  Fed. R. Civ. P. 12(c).  The pleadings are not closed where, as here, the Defendant has not filed an answer.  <u>See</u> <u>Lillian B. ex rel. Brown v. Gwinnett Cnty. Sch. Dist.</u>, 631 F. App'x 851, 852–53 (11th Cir. 2015) ("The [defendant] hadn't filed an answer when it moved for judgment on the pleadings, so the pleadings weren't closed at that time.").  Thus, a motion for judgment on the pleadings is premature at this time.  <u>See</u> <u>id.</u>

Jackson v. BellSouth Telecomm., 372 F.3d 1250, 1262–63 (11th Cir. 2004) (citations omitted).   Indeed, while "[s]pecific facts are not necessary," the complaint should "'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"   Erickson v. Pardus, 551 U.S. 89, 93 (2007) (per curiam) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). Further, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face."   Twombly, 550 U.S. at 570.   "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."   Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556).

The "plaintiff's obligation to provide the grounds of [her] entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."   Twombly, 550 U.S. at 555 (citations omitted); see also Jackson, 372 F.3d at 1262 (explaining that "conclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal") (citations and quotations omitted).   Indeed, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions," which simply "are not entitled to [an] assumption of truth."   See Iqbal, 556 U.S. at 679.   Thus, in ruling on a motion to dismiss, the Court must determine whether the complaint contains "sufficient factual matter, accepted as true, to 'state a

claim to relief that is plausible on its face.'"   Id. at 678 (quoting Twombly, 550 U.S. at 570).

## II.   Background[3]

Ambrose is a disabled veteran.   Complaint ¶ 1.   She suffers from lupus, rheumatoid arthritis, an anxiety disorder, and a panic disorder.   Id. ¶ 14.   Her young son, B.D., attends Hickory Creek Elementary School, which is in Defendant's school district.   See id. ¶¶ 1, 19.   Other Hickory Creek students in B.D.'s subdivision take the bus to school, see id. ¶¶ 37–38, but, because of Defendant's bus transportation policy, B.D. cannot do so.   See id. ¶¶ 40–41. Pursuant to its policy, Defendant does not provide bus transportation for families that live less than 2 miles from the school.   Id. ¶¶ 3, 33.   B.D. lives 1.9 miles from the school, and as a result does not qualify to ride the bus.   See id. ¶¶ 4, 40.   But Ambrose cannot drive B.D. to school because of her disabilities, which frequently prevent her from leaving the house.   See id. ¶¶ 43, 46.   She also cannot walk B.D. to school due to her mobility constraints. Id. ¶ 44.   And B.D., who is five years old,[4] cannot walk to school safely by himself.   See id. ¶¶ 44–45.

_____

[3] In considering a motion to dismiss, the Court must accept all factual allegations in the complaint as true, consider the allegations in the light most favorable to the plaintiff, and accept all reasonable inferences that can be drawn from such allegations.   Miljkovic v. Shafritz and Dinkin, P.A., 791 F.3d 1291, 1297 (11th Cir. 2015).   As such, the recited facts are drawn from the Complaint and may differ from those that ultimately can be proved.

[4] B.D. was five years old at the time the Complaint was filed.   See Complaint ¶ 1.   He started kindergarten in Fall 2021.   See id. ¶ 51.

With B.D.'s inability to ride the bus and Ambrose's inability to provide reliable transportation, Ambrose must "beg family members and neighbors for assistance" in taking B.D. to and from school. <u>Id.</u> ¶¶ 47–48. When no assistance is available, B.D. misses school. <u>See id.</u> ¶¶ 49, 54. According to Plaintiffs, Defendant had "a 'hardship exemption' to the two-mile rule" at the beginning of B.D.'s kindergarten year, so Ambrose requested a waiver to allow B.D. to ride the bus. <u>Id.</u> ¶¶ 51–52. But Defendant denied the request, and later "removed the hardship exemption from its policies."[5] <u>Id.</u> ¶ 53. A few months later,[6] Ambrose asked Defendant to modify the two-mile rule to

---

[5] In the Motion, Defendant asserts that Ambrose applied for Defendant's Provisional Transportation Waiver Program in Fall 2021, and that it denied this application because waivers are only available to students who live more than two miles from school. <u>See</u> Motion at 4–5. Defendant requests that the Court take judicial notice of its policy, which it says is viewable online. <u>See</u> Motion at 5 & n.4; <u>see also</u> <u>Provisional Transportation Waiver Program</u>, St. Johns County School District (last updated Sept. 9, 2021), http://www.stjohns.k12.fl.us/transportation/ptwaiver/ [hereinafter "PTWP Policy"]. Plaintiffs do not appear to oppose this request. A court may take judicial notice of matters of public record and consider those facts in resolving a motion to dismiss. <u>See</u> <u>Long v. Slaton</u>, 508 F.3d 576, 577 n.3 (11th Cir. 2007) (referencing a report—attached to a response to a motion to dismiss—from a state agency because "the document's authenticity and veracity are in this case unchallenged"). In fact, pursuant to Rule 201(c)(2) of the Federal Rules of Evidence, "[t]he court must take judicial notice if a party requests it and the court is supplied with the necessary information." Accordingly, because Defendant relies on and has supplied the Court with the PTWP Policy, which qualifies as a public record and which Plaintiffs do not challenge, the Court will take judicial notice of it. However, it is unclear if the PTWP Policy viewable online is the same policy described in the Complaint. <u>See</u> Complaint ¶ 52 (describing an exemption to the two-mile rule). Indeed, in the Complaint Plaintiffs allege that Ambrose sought a waiver under a hardship exemption that Defendant "removed . . . from its policies" soon afterwards. <u>Id.</u> ¶ 53. The Court also notes that the PTWP Policy states that it was "[r]evised 09/09/2021," i.e. September 9, 2021, and not "August 9, 2021" as described in the Motion. PTWP Policy; Motion at 5. Also, the fact that the PTWP Policy was amended in Fall 2021 is consistent with Ambrose's allegation that Defendant altered its policy after her request for an exemption. <u>See</u> Complaint ¶ 53.

[6] Ambrose requested a hardship waiver "in fall 2021," Complaint ¶ 51, and requested a rule modification "[i]n winter 2021." <u>Id.</u> ¶ 55.

"provide her a reasonable modification to the two-mile rule by allowing B.D. to use the bus stop at the front of their subdivision." Id. ¶ 55. Defendant declined to do so. Id. ¶ 56. Ambrose asked Defendant to reconsider in March of 2022, asserting that the denial violated her and B.D.'s federal rights, but Defendant ignored her request. Id. ¶¶ 57–58. To date, Defendant has not provided Ambrose or B.D. with any accommodation or modification to its rules. Id. ¶ 59.

In the Complaint, Plaintiffs seek compensatory and declaratory relief, along with an injunction requiring Defendant "to provide a reasonable modification to the two-mile rule." Id. at 20. In Count I, Ambrose asserts that Defendant was deliberately indifferent to her rights under the Americans with Disabilities Act ("ADA") by failing to accommodate her disability. See id. ¶¶ 70–74. In Count II, B.D. raises a claim of associational discrimination under the ADA based on his mother's disability status. See id. ¶¶ 78–85. In Counts III and IV, each Plaintiff asserts the same claim as in Counts I and II, respectively, but under Section 504 of the Rehabilitation Act ("Section 504"). See id. ¶¶ 89–96, 100–07. Last, in Count V, Ambrose alleges that she experienced unlawful discrimination under Article I, Section II of the Florida Constitution. See id. ¶¶ 110–15.

### III.   Summary of Arguments

In the Motion, Defendant contends that both Ambrose and B.D. have failed to state any claim for relief.   <u>See</u> Motion at 2–3.   As to Ambrose's claims, Defendant makes three primary arguments.   First, Defendant argues that Ambrose is not a qualified individual with a disability as defined by the ADA because she does not meet the essential requirements for bus transportation services or education.   <u>See</u> <u>id.</u> at 7–10.   Second, Defendant argues that Ambrose has not been denied meaningful access to any benefit because B.D. "makes it to and from school 'most of the time.'"   <u>See</u> <u>id.</u> at 12.   Third, Defendant argues that Ambrose was not subjected to disability-based discrimination because her home's location—not her disability—was the reason she was denied services.   <u>See</u> <u>id.</u> at 15–17.   Further, Defendant asserts that Ambrose cannot establish intentional discrimination because she never notified Defendant of any hazardous conditions on B.D.'s route, and because school officials responded reasonably to Ambrose's requests for accommodation.   <u>See</u> <u>id.</u> at 16–17.   According to Defendant, these arguments foreclose all of Ambrose's claims.   <u>See</u> <u>id.</u> at 6 (asserting that the same standards apply to Ambrose's claims under the ADA, Section 504, and the Florida Constitution).[7]

_____

[7] Ambrose disputes that her constitutional claim should be evaluated under the same standard as her ADA and Section 504 claims.   <u>See</u> Response at 20.   She distinguishes Defendant's authority because it relies on the Florida Civil Rights Act, not the Florida Constitution directly.   <u>See</u> <u>id.</u>   According to Ambrose, the Court should apply strict scrutiny to Defendant's policy, but, because she has stated a claim under the ADA, her Complaint

Ambrose responds that she is a qualified individual with a disability because she could benefit from Defendant's transportation policy if it were reasonably modified to accommodate her disabilities.  Id. at 14.  She further argues that the policy subjects her to discriminatory effects because the two-mile rule disadvantages her compared with non-disabled parents.  See Response at 13. According to Ambrose, in her Complaint she pleads that Defendant subjected her to discrimination and was deliberately indifferent to her needs by refusing to either grant a waiver or modify the two-mile rule.   Response at 18–19.

As to B.D., Defendant primarily argues that neither Title II of the ADA nor Section 504 authorize associational discrimination claims under the facts that Plaintiffs allege.  See Motion at 17–18.[8]  Defendant relies on Todd v. Carstarphen, 236 F. Supp. 3d 1311 (N.D. Ga. 2017), in support of this argument.  See Motion at 17–18.  In response, B.D. contends that Todd was wrongly decided and that B.D.'s claim is cognizable under McCullum v. Orlando

---

should survive a motion to dismiss even under Defendant's standard.  See id.

[8] Defendant also contends that, "to the extent the Complaint alleges that B.D. is unable to walk to school because he has a disability," he has failed to exhaust his administrative remedies under the Individuals with Disabilities Education Act.  Motion at 18 (emphasis added).  Although Plaintiffs do assert that B.D. "has had respiratory issues and has previously been prescribed an inhaler," Complaint ¶ 17, neither Ambrose nor B.D. argue that he has a standalone claim under the ADA or Section 504.  See id. ¶ 79 (describing B.D.'s ADA claim as arising from "his familial association with a person with a disability"); id. ¶ 84 ("But for B.D.'s mother having disabilities, B.D. would have equal access . . . ."); id. ¶ 101 (describing B.D.'s Section 504 claim as being "based on his familial association with a person with a disability").  Nor does B.D. claim to be disabled in the Response.  See generally Response. Accordingly, the Court does not address Defendant's argument that B.D. failed to exhaust his administrative remedies.  See Motion at 18–19.

Regional Healthcare Sys., Inc., 768 F.3d 1135 (11th Cir. 2014). See Response at 6. B.D. further argues that Title II, Section 504, and the implementing regulations require the application of the same associational discrimination standard as a Title I or III ADA claim. See id. at 6–9. Accordingly, B.D. asserts that Defendant impeded his access to school based on his relationship to Ambrose, and thus argues that he has stated a cognizable claim for associational discrimination under the ADA and Section 504. See id. at 11–12.

## IV. Discussion

The Court will first address Ambrose's claims before turning to B.D.'s claims of associational discrimination.

### A. Ambrose's ADA and Section 504 Claims

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Similarly, pursuant to Section 504, any program or activity that receives federal funding is prohibited from denying an individual with a disability the benefit of or participation in its services "solely by reason of his or her disability." 29 U.S.C. § 794(a). "Only public entities are liable for violations of Title II of the ADA." Edison v. Douberly, 604 F.3d 1307, 1308 (11th Cir. 2010). Defendant does not dispute its status as a public entity subject to the ADA or a recipient of federal

funds subject to the mandates of Section 504.   Because the same general standards apply to discrimination claims under the ADA and Section 504, the Court will analyze them interchangeably for purposes of the Motion.   See Allmond v. Akal Sec., Inc., 558 F.3d 1312, 1316 & n.3 (11th Cir. 2009) ("Because the same standards govern discrimination claims under the Rehabilitation Act and the ADA, we discuss those claims together and rely on cases construing those statutes interchangeably.").[9]

## 1.   Qualified Individual with a Disability

Under Title II of the ADA, a "qualified individual with a disability" is someone who has a disability and "meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity," with or without reasonable modifications.   42 U.S.C. § 12131(2).   Defendant argues that Ambrose does not fall within this definition because she fails to meet the "essential eligibility requirements" for School District transportation services.   Motion at 8.   Relying on People First of Alabama v. Merrill, 467 F. Supp. 3d 1179, 1215 (N.D. Ala. 2020), Defendant

---

[9] The Court recognizes some distinction between the ADA and the RA in that "plaintiffs claiming intentional discrimination under the RA must show that they were discriminated against 'solely by reason of [their] disability,' but the ADA requires only the lesser 'but for' standard of causation."   Schwarz v. City of Treasure Island, 544 F.3d 1201, 1212 n.6 (11th Cir. 2008) (citations omitted); see also Sailboat Bend Sober Living, LLC v. City of Fort Lauderdale, 46 F.4th 1268, 1275 (11th Cir. 2022) (analyzing ADA and RA claims together, despite the "important differences between them," because "those differences [were] not relevant to the outcome" of the appeal).   For purposes of this order, that distinction does not impact the Court's analysis.

maintains that the ADA's "reasonable modification" provision does not apply to a program's essential eligibility requirements.  See Motion at 8.  According to Defendant, the two-mile rule is an essential eligibility requirement, and, as such, Ambrose is categorically ineligible for receipt of transportation services. See id. at 8–9.  The Court is not persuaded.

As noted by the court in Merrill, "[a] public entity cannot merely state that the discriminatory requirement is essential to the fundamental nature of the activity at issue—it must provide evidence that the procedural requirement is necessary to the substantive purpose undergirding the requirement." Merrill, 467 F. Supp. 3d at 1216.[10]  In other words, distinguishing essential eligibility requirements from mere rules, policies, and practices is a fact-specific inquiry.  See Mary Jo C. v. New York State & Local Ret. Sys., 707 F.3d 144, 157 (2d Cir. 2013); Alexander v. Choate, 469 U.S. 287, 301 & n.21 (1985) (explaining that "[t]he benefit itself, of course, cannot be defined in a way that effectively denies otherwise qualified handicapped individuals the meaningful access to which they are entitled").  Indeed, "the term 'essential eligibility requirements' does not refer to all formal legal eligibility requirements."  Mary Jo C., 707 F.3d at 157 (emphasis added).

---

[10] The Court notes that although decisions of other district courts are not binding, they may be cited as persuasive authority.  See Stone v. First Union Corp., 371 F.3d 1305, 1310 (11th Cir. 2004) (noting that, "[a]lthough a district court would not be bound to follow any other district court's determination, the decision would have significant persuasive effects.").

Defendant cites to Pritchard v. Florida High School Athletic Association, Inc., 371 F. Supp. 3d 1081, 1087 (M.D. Fla. 2019), as support for its argument that a rule waiver would be a fundamental alteration to its program.  See Motion at 9.  As an initial matter, the Court notes that in Pritchard the court addressed the issue on a motion for a preliminary injunction, not a motion to dismiss where the Court must draw all reasonable inferences in favor of the Plaintiffs.  See Pritchard, 371 F. Supp. 3d at 1083.  More importantly, Pritchard and the cases on which it relies are factually distinguishable in significant respects.  In Pritchard, a high school athlete, who had to repeat the tenth grade due to a learning disability, sought to play football for a fifth consecutive year.  See id. at 1083–84.  In finding that the plaintiff was not likely to succeed on the merits of his ADA claim,[11] the court determined that an age limit for participation in high school athletic programs was essential by relying on persuasive authority that carefully analyzed—on a factually developed evidentiary record—the purpose and significance of age limits in high school sports.  See, e.g., McPherson v. Mich. High Sch. Athletic Ass'n, Inc., 119

---

[11] Although Pritchard involved a motion for a preliminary injunction, not a motion to dismiss, see Pritchard, 371 F. Supp. 3d at 1083, the court later dismissed the relevant counts on the same grounds.  See Pritchard v. Fla. High Sch. Athletic Ass'n, Inc., No. 2:19-cv-94-FtM-29MRM, at 7–11 (M.D. Fla. filed May 6, 2019) (Doc. 38).  However, the Court notes that the plaintiff in Pritchard ultimately succeeded in stating a claim under the ADA and Section 504 after amending his complaint to add additional facts.  See Pritchard v. Fla. High Sch. Athletic Ass'n, Inc., No. 2:19-cv-94-FtM-29MRM, 2020 WL 3542652, at *9 (M.D. Fla. June 30, 2020) (denying defendant's motion for summary judgment on these counts as amended, except to the extent that the plaintiff sought to rely on his alcoholism and hand injury as additional disabilities).

F.3d 453, 461–62 (6th Cir. 1997) (discussing the defendant's "evidence that the absence of an eight-semester rule could lead to widespread red-shirting abuses, and that the rule was 'essential to preserving the philosophy that students attend school primarily for the classroom education . . . .'"); <u>Sandison v. Mich. High Sch. Athletic Ass'n, Inc.</u>, 64 F.3d 1026, 1035 (6th Cir. 1995) (reaching the same conclusion from evidence that an age limit prevented competition between students with different levels of physical maturity).   Here, Defendant points to no factually analogous cases in which courts have determined that the cited eligibility requirement is essential to the program or that a waiver of it would result in a fundamental alteration.   Instead, Defendant unilaterally provides one justification for its insistence on the two-mile rule: the convenience of a bright-line rule.[12]   <u>See</u> Motion at 13–14.   Not only does Defendant not explain why its two-mile rule is "essential" to its transportation scheme, any such explanation would require consideration of information beyond the four corners of Plaintiffs' Complaint.   As such, it would not warrant dismissal at this stage of the proceeding.

---

[12] Defendant does assert that "Ambrose has not pled and cannot establish that [a rule waiver] is reasonable under the circumstances," in part because she does not plead that "there is room on the bus" B.D. seeks to ride.   Motion at 13.   But the reasonableness of an accommodation is "a highly fact-specific inquiry."   <u>Bircoll v. Miami-Dade Cnty.</u>, 480 F.3d 1072, 1085 (11th Cir. 2007) ("The reasonable-modification inquiry in Title II–ADA cases is 'a highly fact-specific inquiry.'"); <u>Merrill</u>, 467 F. Supp. 3d at 1217 (explaining that "a plaintiff need only demonstrate a facially reasonable request" and noting that "[t]his burden is not a heavy one" (quotation marks omitted)).   Moreover, the Court must draw all reasonable inferences in favor of Plaintiffs for purposes of this Motion, <u>see</u> <u>Miljkovic</u>, 791 F.3d at 1297, and it is a reasonable inference that the school bus has room for B.D.

Even assuming Defendant could show that the two-mile rule is or was essential to Defendant's transportation policy, it is not apparent that transportation—in a general sense—is now, or was then, the service or benefit in question.   Indeed, Plaintiffs allege that Defendant "had a 'hardship exemption' to the two-mile rule," and that Defendant "made exceptions to [the two-mile rule] for parents who are not disabled."   Complaint ¶¶ 34, 52.   Accepting these allegations as true, as the Court must, Defendant offered a hardship exception to certain parents who live less than two miles from the school.   It is a reasonable inference that Ambrose, as one such parent, met the eligibility requirements for this exemption—either as written or with reasonable modifications.   See 42 U.S.C. § 12131(2) (defining a "qualified individual with a disability" for purposes of the ADA).   Accordingly, Ambrose has plausibly alleged that she is a qualified individual with a disability for purposes of the Motion.[13]

---

[13] Defendant also argues that Ambrose is not a qualified individual because, not being a student herself, she "is not entitled to a public education."   Motion at 7.   In support, Defendant relies on Todd v. Carstarphen.   Id. (quoting Todd, 236 F. Supp. 3d 1329–30).   In that case, the court noted—citing Georgia law and federal law—that a student's parent was not personally entitled to "the benefit of a public education for her children."   See Todd, 236 F. Supp. 3d at 1329.   Defendant further argues that Florida law provides educational benefits to children, not parents.   See Motion at 7–8.   Plaintiffs disagree.   See Complaint ¶¶ 61–62.   Because the Court concludes that Ambrose sufficiently pleaded that she is a qualified individual under a different theory, the Court need not resolve this question for purposes of the instant Motion.   See Winstead v. Lafayette Cnty. Bd. of Cnty. Comm'rs, 197 F. Supp. 3d 1334, 1340–41 (N.D. Fla. 2016) (explaining that a court must evaluate a motion to dismiss by determining whether the alleged facts are sufficient to state a plausible claim for relief, not by comparing the viability of the plaintiff's specific legal theories).

## 2. Meaningful Access

Defendant next argues that Ambrose was not denied meaningful access to any benefit "because B.D. makes it to and from school 'most of the time.'" Motion at 12.    Under the ADA and Section 504, a defendant need not accommodate a plaintiff who has meaningful access to the benefits in question. See Alexander, 469 U.S. at 301–03 (holding that a 14-day limit on Medicaid services did not deny plaintiffs meaningful access to those services for purposes of Section 504); see also Randolph v. Rodgers, 170 F.3d 850, 858 (8th Cir. 1999) (finding that, like Section 504, the ADA requires meaningful access).    In particular, Defendant cites Todd, 236 F. Supp. 3d at 1334, for the proposition that difficulty does not preclude meaningful access.    See Motion at 12.    Like the instant case, Todd involved a parent who was unable to drive her children to school due to a disability.    See Todd, 236 F. Supp. 3d at 1316.    For several reasons, Todd is not compelling here.

First, Todd came before the court on a motion seeking preliminary and permanent injunctive relief.    Id. at 1315.    The court denied relief, but only after "carefully evaluat[ing] the evidence presented . . . and the credibility of the witnesses."    Id. at 1329.    This included evidence that the children had "reasonable, safe access" to school because, based on their ages and specific distance from school, they could "reasonably walk to school by themselves."    Id. at 1331.    No such evidence is available or considered here, because in resolving

the Motion, the Court accepts Plaintiffs' well pleaded allegations of fact and draws all reasonable inferences in their favor.   See Milikovic, 791 F.3d at 1297. Further, the defendant in Todd offered the plaintiff multiple alternative accommodations, all of which the plaintiff rejected.   See id. at 1334–35 (describing the availability of a student-led walking group and a parent who had volunteered to drive the plaintiff's children).   In contrast, Ambrose has pleaded that she has no consistent alternatives for driving B.D. to school, and that Defendant has not offered any accommodations.   See Complaint ¶¶ 49, 59.[14]   Ambrose further alleges that B.D. often misses school entirely when assistance is unavailable.[15]   See Complaint ¶ 54.   Accordingly, Todd is

---

[14] On this point, Defendant argues that it "had no obligation to offer Ambrose a different accommodation" because Ambrose did not request any alternatives.   See Motion at 14.   Defendant argues that a plaintiff bringing a failure-to-accommodate claim "must show that she requested an accommodation or that the need . . . was obvious."   Id.   (quoting Medina v. City of Cape Coral, 72 F. Supp. 3d 1274, 1278 (M.D. Fla. 2014)).   But Defendant ignores that Ambrose has pleaded that she did request an accommodation.   See Complaint ¶ 57.   Although a defendant need not provide the same accommodation a plaintiff requests, that relates to whether the defendant "refused to provide" an accommodation, not whether one was requested.   See Medina, 72 F. Supp. 3d at 1279–80 (granting a defendant's motion for summary judgment, even though the plaintiff did not receive her requested accommodation, because the defendant's existing accommodations rendered the request unnecessary for meaningful access).   Accordingly, Defendant's argument that Ambrose cannot state a claim without having suggested alternative accommodations does not address Plaintiffs' claims in this action.   See Motion at 14.

[15] In arguing that B.D. was not denied meaningful access (despite missing school) because he could attend "most of the time," see Motion at 12, Defendant quotes Todd's analysis of another case, Ganstine v. Secretary, Florida Department of Corrections, 502 F. App'x 905 (11th Cir. 2012).   See Motion at 12.   While Todd summarizes Ganstine as holding that a wheelchair-bound "inmate was not denied meaningful access" to a prison weightlifting facility because he could "go 'wherever he needed to go' 'most of the time,'" see Todd, 236 F. Supp. 3d at 1329, the Court is not convinced that this summary is accurate.   Indeed, the Ganstine court never uses the phrase "meaningful access."   Instead, the court noted the plaintiff's admission that orderlies were available to push him "most of the time," that he could push himself on the "rare occasion" when they were not, and that—in the "one instance" when an orderly

unpersuasive for purposes of the instant Motion. Although "the Complaint does not state specifically how many days B.D. has been unable to attend school," Motion at 11, Plaintiffs plausibly allege that B.D. is denied meaningful access for purposes of stating a claim for relief.

### 3.   Because of Disability

Defendant also argues that any differential treatment that Ambrose experienced was not because of her disability, but because of the location of her home. <u>See</u> Motion at 15. But Ambrose alleges that Defendant has made exceptions to the two-mile rule for some parents who were not disabled. <u>See</u> Complaint ¶¶ 34, 52. Although Defendant characterizes this as a "conclusory allegation," <u>see</u> Motion at 15, [16] the Court is not persuaded by this characterization. Ambrose's allegation is one of fact, and the Court must

---

refused to push the plaintiff—the prison assigned a new orderly when the plaintiff complained. <u>Ganstine</u>, 502 F. App'x at 910. From these admissions, the court held that no reasonable jury could conclude that the prison "denied [the plaintiff] access because of his disability." <u>Id.</u> Unlike the present case, it is not clear that the plaintiff in <u>Ganstine</u> was denied access, meaningfully or otherwise. To the extent that <u>Ganstine</u> could be read as a meaningful access case, the Court is not convinced, in the absence of evidentiary development, that meaningful access to a prison weightlifting facility requires the same regular attendance as early childhood education, nor does Defendant make such an argument.

[16] Defendant also asserts that its PTWP Policy "does not operate as a waiver of the Two-Mile Rule." <u>See</u> Motion at 15. As previously noted, it is unclear whether Plaintiffs' reference to the "'hardship exemption' to the two-mile rule" in the Complaint refers to the PTWP Policy Defendant identifies. <u>See</u> Complaint ¶ 52. This is especially true because Defendant asserts that the PTWP Policy is <u>not</u> an exemption to the two-mile rule at all. <u>See</u> Motion at 5. At this stage in the proceedings, the Court cannot determine whether the "hardship exemption" and the PTWP policy are the same thing. Even if it could, the Court would be required to accept the allegation that the PTWP Policy was modified after Ambrose's request. <u>See</u> Complaint ¶ 53 (alleging that Defendant "removed the hardship exemption from its policies").

accept the alleged facts as true for purposes of the Motion.   See Ashcroft, 556 U.S. at 678.   Accordingly, this argument is unavailing.

While Defendant analogizes to Pritchard in asserting that Ambrose is categorically ineligible for transportation services, see Motion at 15, the Court notes that the plaintiff in Pritchard later survived a motion to dismiss on the same claim after amending his complaint to allege that the rule at issue was not neutrally applied.   See Pritchard v. Fla. High Sch. Athletic Ass'n, Inc., No. 2:19-cv-94-FtM-29MRM, 2019 WL 3503019, at *5 (M.D. Fla. Aug. 1, 2019) ("While the Court dismissed the Rehabilitation Act claim in plaintiff's previous complaint on [qualified-individual and causation] grounds . . . , the Court finds the Amended Complaint alleges sufficient additional facts to survive a motion to dismiss . . . ."). Thus, Pritchard does not support the proposition that a facially neutral rule cannot give rise to an ADA or Section 504 claim.   See Holly v. Clairson Indus., LLC, 492 F.3d 1247, 1263 (11th Cir. 2007) (explaining, in the employment context, that "[a]llowing uniformly-applied, disability-neutral policies to trump the ADA requirement of reasonable accommodations would utterly eviscerate that ADA requirement").   Because Ambrose alleges that Defendant waived the two-mile rule for non-disabled individuals but not for her, she has plausibly alleged discrimination on the basis of disability.[17]   To the

---

[17] Defendant also argues that Plaintiffs have not sufficiently alleged that Defendant was deliberately indifferent to Ambrose's rights.   See Motion at 17 (quoting Liese v. Indian

extent that the Motion seeks dismissal of Ambrose's claims for failure to state plausible claims for relief, it is due to be denied.[18]

## B.   B.D.'s Claim of Associational Discrimination

In Counts II and IV, B.D. brings claims for associational discrimination pursuant to the ADA and Section 504, respectively.   See Complaint at 14, 17. Defendant argues that B.D.'s claims should be dismissed because associational discrimination claims "are not cognizable in this case."   See Motion at 17.   In support, Defendant cites Todd, 236 F. Supp. 3d at 1339, in which the court distinguishes Title II claims from those brought under Titles I and III of the ADA.   See Motion at 17; Todd, 236 F. Supp. 3d at 1339 (concluding that Title II does not protect non-disabled individuals).   B.D., in contrast, relies on McCullum, 768 F.3d at 1142, to argue to the contrary.   See Response at 2.   In that case—although it did not reference Title II directly—the Eleventh Circuit noted that "non-disabled individuals have standing to bring claims when they are injured because of their association with a disabled person."   See id.

---

River Cnty. Hosp. Dist., 701 F.3d 334, 349 (11th Cir. 2012)).   This argument is without merit because Ambrose alleges that Defendant denied both her hardship exemption and her request for a reasonable rule modification.   See Complaint ¶¶ 52–53, 55–56.   According to Defendant, these allegations at most "represent a misunderstanding of Ambrose's unique needs."   Motion at 17.   But, in making this argument, Defendant is construing the facts in the light most favorable to it, not Ambrose.   Accordingly, this argument does not provide a basis for the dismissal of Plaintiffs' Complaint.

[18] Defendant's only argument for dismissing Ambrose's Florida Constitution claim is that this claim is "construed in conformity with the ADA."   Motion at 6.   The Court need not reach this issue in light of the Court's determination that Ambrose has stated a plausible ADA claim.

In analyzing the parties' arguments, the Court begins with the text of Title II.  Title II prohibits discrimination against "a qualified individual with a disability . . . by reason of such a disability."  42 U.S.C. § 12132.  However, Title II's standing provision is broader: it provides a remedy to "<u>any person</u> alleging discrimination on the basis of disability in violation of" Title II.  <u>Id.</u> § 12133 (emphasis added).  Significantly, non-disabled individuals only have standing if they allege that Title II has been violated.  <u>See id.</u>  And Title II is only violated when there is discrimination against a "qualified individual <u>with a disability</u>."  <u>Id.</u> § 12132 (emphasis added).  While the court in <u>Todd</u> concluded that Title II does not prohibit "discrimination against <u>nondisabled</u> individuals," <u>see</u> <u>Todd</u>, 236 F. Supp. 3d at 1337, this does not necessarily mean that nondisabled individuals do not have a cause of action.  Were the Court to find <u>Todd</u> persuasive, it would simply mean that a non-disabled person must allege an injury flowing from discrimination against someone with a disability. [19]  Such an interpretation would not contradict the Eleventh Circuit's binding decisions.  <u>See</u> <u>McCullum</u>, 768 F.3d at 1143 (holding that "the threshold for associational standing under both the RA and the ADA is the same: non-disabled persons have standing to seek relief under either statute

---

[19] Indeed, the <u>Todd</u> court acknowledged this distinction, observing that "[t]o the extent 'any person aggrieved'" by a violation of the RA has standing to sue, "this does not alter the conduct for which the aggrieved person may sue—namely, discrimination against 'qualified individual[s] with a disability.'"  <u>Todd</u>, 236 F. Supp. 3d at 1341 n.58.

only if they allege that they were personally excluded, personally denied benefits, or personally discriminated against because of their association with a disabled person").[20]   If the discrimination was against a non-disabled individual, the standing provision does not apply because Title II has not been violated.   See 42 U.S.C. § 12132–12133.   But if a non-disabled person brings a claim based on discrimination against a disabled person, § 12133 appears to supply that person with a remedy.[21]   See id.   As discussed above, B.D. has alleged discrimination against a disabled individual: Ambrose.   And B.D. has plausibly alleged that this discrimination denied him meaningful access to his

_____

[20] It is unclear whether McCullum recognized or analyzed the viability of associational discrimination claims under Title II of the ADA.   See Arce v. Louisiana, No. 16-14003, 2017 WL 5619376, at *11 (E.D. La. Nov. 21, 2017) (declining to treat McCullum as persuasive authority in a Title II case because McCullum "does not distinguish among the ADA's titles, and does not differentiate between organizations versus nondisabled individuals" in its case law and analysis).   On one hand, the court stated the broad proposition that "[i]t is widely accepted that under both the RA and the ADA, non-disabled individuals have standing to bring claims when they are injured because of their association with a disabled person."   See McCullum, 768 F.3d at 1142; see also Arce, 2017 WL 5619376, at *11 (observing that the Eleventh Circuit "exclusively supported this proposition with citations to" Title II cases from other circuits).   On the other hand, the court analyzed the associational claims by examining Title III's statutory language specifically.   See McCullum, 768 F.3d at 1142 (citing Title III as "[t]he section of the ADA conferring standing on a non-disabled party"); see also Todd, 236 F. Supp. 3d at 1341 & n.58 (concluding that the Eleventh Circuit has not addressed associational discrimination claims in a Title II context, and noting that "[t]o the extent 'any person aggrieved'" by a violation of the RA has standing to sue, "this does not alter the conduct for which the aggrieved person may sue—namely, discrimination against 'qualified individual[s] with a disability'").   But for the reasons described above, neither reading of McCullum would require the Court to reach a different result in resolving the instant Motion.

[21] The Court notes that this is different from associational discrimination claims under Title I or III.   Title I, for example, prohibits disability discrimination against any "qualified individual"—disabled or otherwise.   See 42 U.S.C. § 12111(8) (defining "qualified individual" without reference to disability).   Further, Title I's prohibition extends to discrimination "because of the known disability of an individual with whom the qualified individual is known to have a relationship or association."   Id. § 12112(b)(4).   Consequently, Title I affirmatively protects non-disabled people rather than merely granting them third-party standing.

education.   See Complaint ¶ 54.   Thus, at this stage of the proceeding the Court is of the view that Title II allows him to pursue a remedy.   To the extent that the Motion seeks dismissal of B.D.'s claims, it is thus due to be denied, although Defendant can renew its argument at a later time.

## V.   Conclusion

Because Plaintiffs plausibly allege that Defendant discriminated against Ambrose when it denied her waiver request, Defendant's Motion is due to be denied.

Accordingly, it is

**ORDERED:**

1.   Defendant St. Johns County School Board's Motion to Dismiss or for Judgment on the Pleadings (Doc. 13) is **DENIED**.

2.   Defendant must answer the Complaint on or before **April 14, 2023**.

3.   No later than **June 2, 2023**, the parties must appear before the assigned Magistrate Judge for a settlement conference.

4.   In the event the case does not resolve at the settlement conference, the parties must submit an Amended Joint Uniform Case

Management Report no later than 14 days after the Magistrate Judge declares an impasse.

**DONE AND ORDERED** in Jacksonville, Florida this 27th day of March, 2023.

MARCIA MORALES HOWARD
United States District Judge

lc31

Copies to:

Counsel of Record